IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT A. BUSCHOWJR, | ) | CASE NO.  5:25-CV-00037-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Robert Buschow, Jr. ("Plaintiff" or "Buschow"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.     PROCEDURAL HISTORY

In May 2022, Buschow filed an application for POD, DIB, and SSI, alleging a disability onset date of October 1, 2021, and claiming he was disabled due to depression, anxiety, and hypertension. (Transcript ("Tr.") at 15, 57.)  The applications were denied initially and upon reconsideration, and Buschow requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

On January 25, 2024, an ALJ held a hearing, during which Buschow, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 7, 2024, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-24.)  The ALJ's decision became final on December 3, 2024, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On January 10, 2025, Buschow filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8, 10-11.)  Buschow asserts the following assignment of error:

(1) The RFC finding of the ALJ is not supported by the evidence, and the rejection of Plaintiff's treating physician's opinion is legally insufficient.

(Doc. No. 8 at 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Buschow was born in March 1972 and was 51 years-old at the time of his administrative hearing (Tr. 15, 23), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  He has at least a high school education.  (Tr. 23.)  He has past relevant work as a dishwasher.  (*Id.*)

### B.    Relevant Medical Evidence[2]

On November 1, 2021, Buschow saw David Kern, LPCC-S, for a full behavioral health intake. (*Id.* at 345, 353.)  Buschow reported he had been kicked out of his house and "was 'making poor decisions.'"  (*Id.* at 345.)  Buschow told Kern he had been using alcohol more and had recently moved to Akron to try and start over.  (*Id.*)  Buschow reported daily sadness and depressive mood, decreased sleep, nervousness, feelings of sadness/hopelessness, loss of interest/pleasure, low energy/fatigue, increased

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, as Buschow challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to Buschow's mental impairments.

appetite/weight gain, and mood swings.  (*Id.*)  Buschow told Kern his anger was verbal, not physical.  (*Id.*)  Triggers of his anger included "'being judged the wrong way'" and that people would stop talking to him as a result of his anger.  (*Id.*)  Buschow reported that being around too many people made him anxious.  (*Id.* at 346.)  Buschow lived alone and was unemployed.  (*Id.* at 348.)  On examination, Kern found normal activity, normal eye contact, normal grooming/hygiene, normal speech, constricted/blunted affect, cooperative behavior, anxious mood, full orientation, good insight and judgment, and concrete thoughts.  (*Id.* at 349-50.)  Kern diagnosed Buschow with major depressive disorder, recurrent, mild, and unspecified anxiety disorder.  (*Id.* at 350.)

On November 19, 2021, Buschow saw Yuan-Hua Thakore, M.D., for an initial psychiatric evaluation.  (*Id.* at 354-58.)  Buschow reported feeling depressed, sad, and lonely.  (*Id.* at 355.)  He told Dr. Thakore he had few friends and no family, and he was alone most of the time.  (*Id.*)  He enjoyed watching movies, Browns games, and professional wrestling, taking long walks, and playing online games.  (*Id.*)  He hoped to get a job and a nice place of his own.  (*Id.*)

On examination, Dr. Thakore found average activity, average eye contact, clear speech, concrete thought process, intact associations, normal thought content, normal perception, fair judgment and insight, full orientation, normal memory, good attention and concentration with minimal distractibility, appropriate affect, moderate anxiety, moderate depression, and disheveled appearance.  (*Id.* at 356.) Dr. Thakore diagnosed Buschow with dysthymia and alcohol use disorder, severe, in early remission, in controlled environment.  (*Id.* at 357.)  Dr. Thakore prescribed Lexapro.  (*Id.*)

On December 14, 2021, Buschow saw Benjamin Nelson, LPC, for individual psychotherapy.  (*Id.* at 362-63.)  Buschow reported he was still staying at The Haven of Rest and had some trouble sleeping at times as some people in his dorm snored loudly.  (*Id.* at 363.)  Buschow told Nelson he was doing well on his medication and was "continuously applying for jobs as a dishwasher."  (*Id.*)  On examination, Nelson

found appropriate affect, cooperative behavior, euthymic mood, full orientation, fair insight and judgment, and logical thought process. (*Id.* at 362.)

On January 10, 2022, Buschow saw Yuan-Hua Thakore, M.D., for follow up. (*Id.* at 367, 370.) Buschow reported doing better on his medication; he was less irritable and able to ignore irritating things. (*Id.* at 367.) Dr. Thakore noted Buschow had a case manager at Portage Path Behavioral Health and the case manager had applied for respite stay to give Buschow a break from Haven of Rest. (*Id.*) Buschow reported he had connected with a homeless outreach program and had applied for housing and disability. (*Id.*) On examination, Dr. Thakore found average eye contact, clear speech, concrete thought process, normal thought content, normal perception, poor insight, fair judgment, normal memory, good attention and concentration with minimal distractibility, appropriate affect, mild anxiety, and mild depression. (*Id.* at 367-68.) Buschow's diagnoses consisted of dysthymia and alcohol use disorder, severe, in early remission, in a controlled environment. (*Id.* at 368.) Dr. Thakore found both conditions to be stable or improved. (*Id.*) Dr. Thakore continued Lexapro. (*Id.* at 369.)

On January 19, 2022, Buschow saw Nelson for follow up and reported a "difficult incident" had occurred at The Haven of Rest the other day when someone insulted Buschow's deceased mother. (*Id.* at 373.) Buschow told Nelson he had come close "to using racial slurs toward the person but that he was able to control himself." (*Id.*) Buschow reported his medication helped keep him calmer. (*Id.*) On examination, Nelson found appropriate affect, cooperative behavior, euthymic mood, full orientation, fair insight and judgment, and logical thought process. (*Id.* at 372.)

On February 9, 2022, Buschow saw Nelson for follow up and reported he had had a good stay at Respite and had moved back to The Haven of Rest. (*Id.* at 374-75.) Nelson noted Buschow was engaged throughout the treatment process and open to feedback. (*Id.* at 375.) On examination, Nelson found appropriate affect, cooperative behavior, euthymic mood, full orientation, fair insight and judgment, and

logical thought process.  (*Id.* at 374.)  Nelson found Buschow's overfall functioning to be "[s]omewhat poor (client is able to effectively function for sustained periods between clinical contacts)."  (*Id.* at 375.)

On March 7, 2022, Buschow saw Dr. Thakore for follow up and reported he was "doing fine."  (*Id.* at 376, 380.)  Buschow told Dr. Thakore his medication was helping, he was staying calm and not getting angry, he was sleeping well, and he had good energy levels.  (*Id.* at 377.)  On examination, Dr. Thakore found average eye contact, clear speech, logical thought process, intact associations, normal thought content, fair judgment and insight, full orientation, normal memory, good attention and concentration with minimal distractibility, appropriate affect, mild anxiety, mild depression, and poor grooming.  (*Id.* at 377-78.)  Dr. Thakore found Buschow's dysthymia and alcohol use disorder to be stable or improved and continued Lexapro.  (*Id.* at 379.)

On April 22, 2022, Buschow saw Mark Werstler, PMHNP-BC, for medication management and reported that he was struggling with housing, and he was becoming anxious about it.  (*Id.* at 382-83, 387.)  Buschow told Werstler his medication was working well to control his anxiety and mood.  (*Id.* at 383.)  On examination, Werstler found agitated activity, average eye contact, clear speech, logical thought process, intact thought associations, normal thought content, normal perceptions, fair insight and judgment, full orientation, normal memory, good attention and concentration with minimal distractibility, appropriate affect, mild anxiety, mild depression, and adequate grooming.  (*Id.* at 383-84.)  Werstler continued Lexapro.  (*Id.* at 385.)

On June 27, 2022, Buschow saw Dr. Thakore for medication management.  (*Id.* at 390, 394.)  On examination, Dr. Thakore found average activity, average eye contact, clear speech, concrete thought process, intact associations, normal thought content, normal perception, fair insight and judgment, normal memory, good attention and concentration with minimal distractibility, appropriate affect, moderate

5

anxiety, mild depression, and poor grooming.  (*Id.* at 391-92.)  Dr. Thakore continued Lexapro.  (*Id.* at 393.)

On October 5, 2022, Buschow saw Daniel Langer, Ed.D., for individual psychotherapy and reported mild to moderate depression and anxiety.  (*Id.* at 400-01.)  Buschow wanted to start therapy and see a prescriber for medication.  (*Id.* at 400.)  On examination, Dr. Langer found slowed activity, normal eye contact, normal grooming, impoverished speech, cooperative and withdrawn behavior, anxious and depressed mood, impaired ability to abstract, impaired attention/concentration, fair insight and judgment, and concrete and impoverished thought.  (*Id.*)

On October 27, 2022, Buschow saw Dr. Thakore for medication management and reported doing well.  (*Id.* at 402, 406.)  He told Dr. Thakore he was doing well; he had moved into his own apartment two weeks ago, and he had some pots and pans and an air mattress.  (*Id.* at 402-03.)  He had applied for some furniture.  (*Id.* at 403.)  Buschow reported sleeping well and doing a lot of walking.  (*Id.*)  On examination, Dr. Thakore found average activity, average eye contact, clear speech, concrete, logical thought process, intact associations, normal thought content, normal perception, fair insight and judgment, normal memory, good attention and concentration with minimal distractibility, appropriate affect, no anger, mild anxiety, no depression, and adequate grooming.  (*Id.* at 403-04.)  Dr. Thakore found Buschow's diagnoses stable or improved and continued Lexapro.  (*Id.* at 405.)

On November 4, 2022, Buschow saw Dr. Langer for follow up and reported mild anxiety and depression as he adjusted to living on his own in an apartment that his case manager helped him find.  (*Id.* at 407.)  Buschow told Dr. Langer the apartment was unfurnished, so he was sleeping on the floor, but it was better than staying at the shelter.  (*Id.* at 408.)  His case manager was helping him find furniture and a small refrigerator.  (*Id.*)  On examination, Dr. Langer found normal activity, normal eye contact, normal grooming, impoverished speech, impaired ability to abstract, impaired attention/concentration, appropriate

6

affect, cooperative and withdrawn behavior, anxious and depressed mood, fair insight and judgment, and concrete and impoverished thoughts.  (*Id.* at 407.)

On December 3, 2022, Buschow saw Dr. Langer and reported mild to moderate anxiety and frustration with not being able to furnish his apartment.  (*Id.* at 410.)  Buschow's case manager had found him a refrigerator, but he was still sleeping on the floor.  (*Id.* at 411.)  Buschow told Dr. Langer that an empty apartment was "'a thousand time better'" than living in the shelter.  (*Id.*)  He spent his days watching free movies on his cell phone.  (*Id.*)  On examination, Dr. Langer found cooperative and withdrawn behavior, anxious mood, fair judgment and insight, and concrete and impoverished thoughts.  (*Id.* at 410.)

On February 2, 2023, Buschow saw Dr. Thakore for medication management and reported he was doing well.  (*Id.* at 412, 416.)  Buschow told Dr. Thakore he had received food from the food pantry, he had picked up furniture from thrift stores for his apartment, and had been receiving free clothes and hot meals.  (*Id.* at 413.)  He reported good sleep and appetite.  (*Id.*)  On examination, Dr. Thakore found average activity, average eye contact, clear, pressured speech, concrete thought process, intact associations, normal thought content, normal perception, fair insight and judgment, full orientation, normal memory, good attention and concentration with minimal distractibility, poor grooming, appropriate affect, no anxiety, and no depression.  (*Id.* at 413-14.)  Dr. Thakore determined that Buschow's diagnoses were stable or improved and continued Lexapro.  (*Id.* at 415.)

On February 22, 2023, Buschow saw Joshua Magleby, Ph.D., for a consultative psychological evaluation.  (*Id.* at 336-42.)  Buschow reported trouble adjusting, occasional hyperactivity, and fear of being unable to talk to others.  (*Id.* at 336.)  Buschow also endorsed getting angry too easily sometimes and trying to understand the right way to do things.  (*Id.*)  He also reported sadness, irritability, low energy, lack of motivation, intermittent feelings of worthlessness, hopelessness, and helplessness, and

discomfort around the general public.  (*Id.* at 337.)  He liked being alone.  (*Id.*)  Buschow also endorsed occasional issues with attention and memory.  (*Id.*)  Buschow told Dr. Magleby he could perform his past work as a dishwasher, although "'people look[ed] at [him] like [he's] not trustworthy enough or [he]'d tell them things they would use against [him].'"  (*Id.*)  Buschow reported fair relationships with coworkers and supervisors.  (*Id.*)  He lived alone in an apartment and spent his time at home or at the library playing games on the computer.  (*Id.* at 338.)  He told Dr. Magleby he could perform his activities of daily living independently, although he could not cook from a recipe, and he did not socialize.  (*Id.*)

On examination, Dr. Magleby found fair hygiene, full orientation, appropriate eye contact, normal behavior, linear thought content, normal speech, normal affect, stable mood, no sign of depression or anxiety, adequate judgment, and limited insight.  (*Id.* at 338-40.)  Dr. Magleby further found Buschow "somewhat overly friendly and awkward."  (*Id.* at 338.)  Buschow's diagnoses consisted of persistent depressive disorder, with mixed features, late onset, with pure dysthymic syndrome, mild, and adjustment disorder, with anxiety, chronic.  (*Id.* at 340.)  Dr. Magleby opined Buschow had an average ability to understand, remember, and carry out instructions and concentrate, persist, and maintain pace.  (*Id.* at 341.)  Dr. Magleby further opined Buschow's ability to relate to others and withstand the stress and pressures of day-to-day work activity was "at least mildly impaired."  (*Id.* at 341-42.)

On May 1, 2023, Buschow saw Dr. Thakore for medication management and reported he was doing well.  (*Id.* at 418, 421.)  Buschow told Dr. Thakore he went to a place on Tuesdays, Fridays, and Sundays for hygiene products and hot meals.  (*Id.* at 418.)  He enjoyed watching television.  (*Id.*)  On examination, Dr. Thakore found average activity, average eye contact, clear speech, logical thought process, normal thought content, normal perception, fair judgment and insight, normal memory, good attention and concentration with minimal distractibility, no anger, no anxiety, no depression, and adequate

8

grooming.  (*Id.* at 418-19.)  Dr. Thakore found Buschow's diagnoses to be stable or improved and continued Lexapro.  (*Id.* at 419.)

On August 18, 2023, Buschow saw Dr. Thakore for medication management and reported "multiple stressors," including bed bugs in his apartment and working with his case manager to complete paperwork regarding his apartment.  (*Id.* at 482, 485.)  Buschow told Dr. Thakore he went to church every Sunday but had been going to the library less since he did not like to walk in the heat.  (*Id.* at 482.)  He reported his case manager had been helping him pick up items from donation stores.  (*Id.*)  On examination, Dr. Thakore found average activity, average eye contact, clear speech, concrete thought process, circumstantial associations, normal thought content, normal perceptions, fair insight and judgment, full orientation, normal memory, inability to focus on serial sevens, appropriate mood, mild anxiety, mild depression, and adequate grooming.  (*Id.* at 482-83.)  Dr. Thakore noted Buschow's "[g]rooming ha[d] improved significantly."  (*Id.* at 483.)  Dr. Thakore found Buschow's diagnoses were stable or improved and continued Lexapro.  (*Id.* at 484.)

On August 24, 2023, Dr. Thakore completed a Mental Medical Source Assessment.  (*Id.* at 455-57.)  Dr. Thakore opined that Buschow could understand and remember very short, simple instructions with no observable limits and ask simple questions or request assistance with noticeable difficulty no more than 10 percent of the workday or work week (i.e., one hour or less/day or one-half day or less/week).  (*Id.* at 455-56.)  Dr. Thakore further opined that Buschow could perform the following tasks or functions with noticeable difficulty from 11-20 percent of the work day or work week (i.e., more than one hour/day or more than one-half day/week): remember locations and work-like procedures; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general

public; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (*Id.*) Dr. Thakore further opined that Buschow could perform the following tasks or functions with noticeable difficulty more than 20 percent of the workday or work week (i.e., more than one hour and up to two hours/day or one-half to one day/week): understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; make simple work-related decisions; complete a normal work day and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. (*Id.*) Dr. Thakore further opined that Buschow would likely be absent from work about four days per month due to his mental health symptoms and would be off task over 20% of an eight-hour workday. (*Id.* at 456.) Buschow would need to take unscheduled 10–15-minute breaks about twice per day. (*Id.*) In response to the question as to what medical findings supported the opinion, Dr. Thakore wrote, "Depressed" and "Anxious [with] social anxiety." (*Id.* at 457.)

On December 4, 2023, Buschow saw Dr. Thakore for medication management and reported doing better. (*Id.* at 459, 462.) He told Dr. Thakore he was walking more to lose weight and improve his health, and the bed bugs in his apartment had been removed. (*Id.* at 459.) Buschow reported a stable mood and sleeping well. (*Id.*) On examination, Dr. Thakore found average activity, average eye contact, clear speech, logical thought process, normal thought content, normal perception, fair insight and judgment, full orientation, normal memory, good attention and concentration with minimal distractibility, appropriate

10

mood, mild anxiety, no depression, and adequate grooming.  (*Id.* at 459-60.)  Dr. Thakore found

Buschow's diagnoses were stable or improved and continued Lexapro.  (*Id.* at 461.)

## C.    State Agency Reports

On March 14, 2023, Sonya Adamo, Psy.D., reviewed the file and opined Buschow had no severe

mental impairments.  (*Id.* at 59-60, 68-69.)

On June 25, 2023, on reconsideration, Irma Johnston, Psy.D., reviewed the file and opined

Buschow had no limitation in his ability to understand, remember, or apply information and had moderate

limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage

himself.  (*Id.* at 77, 86.)  Dr. Johnston further opined Buschow should be limited to a routine environment

with non-strict production standards, superficial contact with supervisors, coworkers, and the public, and

infrequent changes.  (*Id.* at 81, 90.)

## D.    Hearing Testimony

During the January 25, 2024 hearing, Buschow testified to the following:

- He lives alone in an apartment.  (*Id.* at 37.)  He is good at taking care of himself, he just doesn't cook.  (*Id.*)  His friend does his laundry for him.  (*Id.*)  He hasn't driven since 2016; he has a fear of being in traffic and behind cars.  (*Id.*)  He sometimes walks to places.  (*Id.* at 38.)  His case manager takes him grocery shopping.  (*Id.*)

- He graduated from high school.  (*Id.*)  He last worked in 2020.  (*Id.*)

- His anxiety and depression prevent him from working.  (*Id.* at 40.)  He tries to get along with people, but he's "not very conversation-like or people-like."  (*Id.*)  He gets "extremely irritated" when people try to talk to him when he's doing something.  (*Id.* at 40-41.)  He takes Lexapro, which helps, although he still feels sad and helpless at times.  (*Id.*)  He gets tired during the day at times and will take a nap.  (*Id.*)  He sees a therapist every three months.  (*Id.*)  He has never been hospitalized for mental health concerns.  (*Id.* at 41-42.)  He experiences crying spells once every two weeks.  (*Id.* at 42.)  He gets upset for no reason.  (*Id.*)  He struggles with a lack of motivation and has problems with his long-term memory.  (*Id.*)  He has trouble focusing and concentrating.  (*Id.*)  He sometimes breaks out in a sweat or tears up every other day because of his anxiety.  (*Id.* at 43.)  Those episodes last at least five minutes.  (*Id.*)

- He enjoys watching TV.  (*Id.*)  Sometimes, he plays Monopoly or Solitaire on his phone.  (*Id.*)  He sometimes watches a movie or listens to music on his phone.  (*Id.*)

11

- He has no family.  (*Id.* at 44.)  He has a few friends he sees in person, and he has an old friend he texts with occasionally.  (*Id.*)  He does some socializing outside his home.  (*Id.*)

- Yesterday, he woke up and watched a little television.  (*Id.* at 46.)  He waited for his case manager to take him grocery shopping.  (*Id.*)  Later that day, he went to St. Bernard Church in Akron because they give out hot meals on Sundays and Mondays from the middle to the end of the month.  (*Id.*)  He came home and watched some television before going to bed.  (*Id.*)

- When he was at Respite, he did not want to be around people who talked a lot.  (*Id.* at 47.)  When he was at the Haven, he got angry being around people.  (*Id.*)  They would talk to him, and he would get so angry.  (*Id.*)  He would get irritated when someone would come say hi to him at the library.  (*Id.*)

- He does not get out of his apartment much.  (*Id.*)  He does like to go say hi to someone else who lives there.  (*Id.*)  Being all by himself is why his mood improved.  (*Id.* at 48.)  Listening to people who are negative, who like to cause trouble or get attention, or who are miserable causes him to be annoyed.  (*Id.*)  He enjoys getting out at times.  (*Id.* at 49.)  He goes down to the library and hangs out there for a bit or he walks for his own enjoyment.  (*Id.*)

- When working as a dishwasher, he had problems with a lack of motivation, his work ethic, and getting along with others.  (*Id.* at 48.)  He felt underestimated and untrustworthy.  (*Id.*)  People kept pushing him to get done what they wanted done.  (*Id.*)

The VE testified Buschow had past work as a dishwasher.  (*Id.* at 52.)  The ALJ then posed the following hypothetical question:

> So now, Ms. Coles, I do have a series of hypothetical questions for you today. With any hypothetical question, I do want you to assume somebody of Mr. Buschow's age, his education, as well as that job history you just described for us.  Now, the first hypothetical individual is at the medium exertional range who does have the following additional limitations.  Never climb ladders, ropes or scaffolds, occasionally climb ramps and stairs.  He would need to avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving.
>
> Now he would be limited to performing simple routine and repetitive tasks and would not, again not be able to perform tasks which require a high production rate pace, for example such as assembly line work.  Now he could interact on an occasional basis with supervisors, coworkers and the general public, but he should be limited to superficial contact, and by that I mean no sales, arbitration, negotiation, conflict resolution or confrontation.  No group, tandem or collaborative tasks, as well as no management, direction or

12

persuasion of others.  And lastly, this individual could respond appropriately to occasional change in a routine work setting.

Would that hypothetical individual be able to perform claimant's past work?

(*Id.* at 52-53.)

The VE testified the hypothetical individual would not be able to perform Buschow's past work as a dishwasher.  (*Id.* at 53.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaner, industrial, order picker, and landscape specialist.  (*Id.*)

The ALJ modified the first hypothetical by reducing social limitation to occasional interaction with supervisors and coworkers in a non-public work setting.  (*Id.*)  The VE testified the previously identified jobs would remain.  (*Id.*)  The ALJ further modified the hypothetical to limit the individual to occasional interaction with supervisors in a non-public setting but otherwise isolated with no interaction or contact with coworkers.  (*Id.*)  The VE testified that those limitations would be work preclusive.  (*Id.* at 53-54.)

In response to further questioning from the ALJ, the VE testified that a limitation that the hypothetical individual would need occasional redirection or extra supervision to stay on task would be work preclusive.  (*Id.* at 54.)  The VE further testified that time off-task could not exceed nine percent.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*, 416.920(a)(4).  See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

14

Here, Buschow was insured on the alleged disability onset date, October 1, 2021, and remains insured through December 31, 2026, the date last insured ("DLI").  (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Buschow must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2.     The claimant has not engaged in substantial gainful activity since October 1, 2021, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: morbid obesity, hypertension, depressive disorder and dysthymia, adjustment disorder with anxiety, anxiety disorder, and alcohol use disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can never climb ladders, ropes, and scaffolds, but he can occasionally climb ramps and stairs. He must avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving. He can perform simple, routine, and repetitive tasks, but cannot perform tasks that require a high production rate pace (for example, such as assembly line work). The claimant can interact on an occasional basis with supervisors, coworkers, and the general public, but should be limited to superficial contact (meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction, or persuasion of others). The claimant can respond appropriately to occasional change in a routine work setting.

15

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on March **, 1972 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-24.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

16

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

17

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.    ANALYSIS

In his sole assignment of error, Buschow argues "that the ALJ failed to explain the factors he used when evaluating [Dr. Thakore's] opinion as required by 20 CFR 404.1520c."  (Doc. No. 8 at 13.) Buschow asserts that the ALJ's analysis of Dr. Thakore's opinion does not contain the words "consistent" or "supportable."  (*Id.*)  Buschow maintains that the ALJ did not mention a single factor other than to identify Dr. Thakore as a treating source.  (*Id.*)  Buschow argues that Dr. Thakore's opinion is supported by the record.  (*Id.* at 16.)  Buschow claims that the only improvement in his condition occurred after he moved into an apartment; "[l]ogic would only hold that a person who was uncomfortable around others, had issues with social interaction, and had problems controlling his anger would improve when given a place to live apart from these situations."  (*Id.*)  Even with improvement, Buschow asserts, he still needed "an exorbitant amount of support from his case manager and others in the mental health system just to help him address the tasks of everyday life."  (*Id.*)  Buschow argues that the ALJ failed to take any of this into account, "despite the fact that it goes directly to the argument that Mr. Buschow could not independently seek, find, and sustain employment."  (*Id.*)  Buschow also asserts that the ALJ failed to build an accurate and logical bridge between the evidence and "either the treatment of Dr. Thakore's opinion or the findings of the residual functional capacity."  (*Id.* at 17.)

The Commissioner responds that the ALJ complied with the regulations in analyzing Dr. Thakore's opinion.  (Doc. No. 10 at 1.)  The ALJ found "that Dr. Thakore provided little explanation for her opinion," which the Commissioner asserts is supported by the opinion itself.  (*Id.* at 13.)  In addition,

the Commissioner argues that "this Court has concluded that check-box opinions are unsupported and a reason to discount a medical opinion"; "[t]his is true, such as here, 'even when the ALJ did not specifically call attention to it in the decision.'" (*Id.* at 13-14) (citations omitted). The Commissioner asserts that the ALJ further found the record failed to support the "substantial mental dysfunction opined by Dr. Thakore." (*Id.* at 14.) In addition, the Commissioner maintains that earlier in the decision, "the ALJ discussed evidence showing that Plaintiff was not as limited as alleged." (*Id.* at 16.)

In his reply, Buschow accuses the Commissioner of engaging in impermissible *post hoc* rationalization, as "the ALJ's reasoning and justification is absent in the record." (Doc. No. 11 at 2.) Buschow argues that the ALJ "failed to explain his findings and the factors used to address a treating opinion" and therefore failed to build an "accurate and logical bridge" between the evidence and his conclusions. (*Id.* at 3.)

Since Buschow's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3)

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

---

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

At Step Two, the ALJ found as follows regarding Buschow's mental impairments:

> In understanding, remembering or applying information, the claimant has a mild limitation. The claimant had only rare instances of impaired concentration. The balance of the exams documented intact cognitive functioning. Moreover, he was able to understand and follow medical advice. The claimant also noted that he did not require reminders to manage his personal care or take medications (3E/4).

> In interacting with others, the claimant has a moderate limitation. The claimant said that the was socially isolated and he did not get along with others (3E; Testimony). However, he maintained some friendships (Testimony). He went to the library and he attended church regularly (3E; Testimony). Additionally, the claimant demonstrated appropriate behavior generally at his exams.

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant had impaired concentration only rarely and the balance of his exams documented good concentration and intact memory. He noted that he watched television and played games on his phone without apparent attention problems (3E). Finally, he was able to follow the proceedings at the hearing and answer questions appropriately.

21

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant lived alone and largely independently. His hygiene improved over time and he had generally adequate grooming. While he received case management services, he performed several household chores, including cleaning, doing laundry, shopping, and preparing simple meals (3E).

(Tr. 18-19.)

Later in the opinion, the ALJ weighed and analyzed Dr. Thakore's opinion as follows:

> Yuan-Hua Thakore, M.D. said that the claimant would be unable to perform numerous functions 11-20% of the day and unable to perform some functions more than 20% of the day, including following detailed instructions, maintaining attention for extended periods, making simple work- related decisions, getting along with others, maintaining appropriate behavior, and completing a normal workday without interruption for psychological symptoms (6F). Dr. Thakore stated that the claimant would miss work about 4 days per month, take 2 unscheduled breaks per day, and miss work more than 20% of the time (6F). I find Dr. Thakore's opinion unpersuasive. Although Dr. Thakore treated the claimant, the record failed to document any such substantial mental dysfunction. While he had some pressured speech, concrete thoughts, and poverty of thought at times, he generally displayed appropriate behavior, logical thoughts, and intact cognitive functioning. His condition improved over time and there was little explanation of why the claimant would miss work and be off task regularly.

(*Id.* at 22.)

In contrast, the ALJ found the opinion of state agency reviewing psychiatrist Dr. Johnston persuasive for the following reasons, a finding Buschow does not challenge on judicial review:

> At the reconsideration level, Irma Johnston, Psy.D., opined that the claimant was limited to a routine environment with non-strict production standards (8A/7). Dr. Johnston said that the claimant could have superficial contact with coworkers, supervisors, and the public (8A/7). According to Dr. Johnston, the claimant was limited to infrequent changes (8A/7). I find Dr. Johnston's opinion persuasive because she based her conclusions on her review of the record. Moreover, the evidence as a whole confirmed that the claimant could perform work tasks in the static and socially restricted environment Dr. Johnston described. Indeed, with treatment, the claimant's condition stabilized and despite some concrete thoughts and pressured speech, he maintained appropriate behavior, intact cognition, and fair judgment and insight, which findings are consistent with Dr. Johnson's opinion.

(*Id.*)

In addition, elsewhere in the RFC analysis, the ALJ found as follows:

> In terms of the claimant's mental conditions, the claimant had ongoing depression and anxiety with periodic concrete thoughts, some poor hygiene, and pressured speech. Nevertheless, with consistent treatment, his condition improved and stabilized over time. Indeed, he generally appropriate behavior, improved hygiene, intact attention and memory, and fair judgment and insight. Accordingly, the claimant could perform simple tasks in the relatively static and socially limited environment of the residual functional capacity.

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence of record and the opinions of the individuals that have had the opportunity to review the claimant's records and examine the claimant. Furthermore, I do not find that the claimant's symptoms are so severe as to prohibit him from performing all basic work activities. The residual functional capacity set forth above addresses the claimant's symptoms to the degree supported by the evidence as a whole.

(*Id.* at 22-23.)

The ALJ considered the supportability and consistency of Dr. Thakore's opinions as required by the regulations, discussing evidence that was unsupportive of disability in the process.  (*Id.* at 18-23.) "[A]n ALJ need not specifically use the terms 'supportability' or 'consistency' in [the] analysis." *Adams v. Comm'r of Social Sec.*, Case No. 1:21-CV-02199-PAB, 2023 WL 2373541, at *6 (N.D. Ohio Jan. 23, 2023) (citing *Hardy v. Comm'r of Soc. Sec.*, 2021 WL 4059310 at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec.*, 2022 WL 969560, at *5 (S.D. Ohio March 31, 2022); *Fowler v. Comm'r of Soc. Sec.*, 2022 WL 3648436, at *9 (N.D. Ohio Aug. 9, 2022), *report and recommendation adopted by* 2022 WL 3647771 (N.D. Ohio Aug. 24, 2022)), *report and recommendation adopted by Adams v. Kijakazi*, 2023 WL 2347368 (N.D. Ohio Mar. 3, 2023).  Furthermore, while Buschow points to records regarding his mental impairments that he claims supports his interpretation of the evidence, "[r]eciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence." *Garcia v. Comm'r of Soc. Sec.*, No. 1:22-CV-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023).

In addition, as the Commissioner notes, the ALJ was entitled to find Dr. Thakore's medical source statement opinion unpersuasive because it was not accompanied by an explanation of the limitations. The regulations specify that an opinion's persuasive value is based on both the objective evidence and "supporting explanations." *Duke v. Comm'r of Soc. Sec.*, Case No. 21 CV 39, 2022 WL 1075171, at *3 (N.D. Ohio April 11, 2022) (citing 20 C.F.R § 404.1520c). "Courts frequently find that check-box forms, unaccompanied by explanation, are unsupported. *See, e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016) ("The Court has held that an ALJ properly discounted a treating source's questionnaire because the source failed to provide any explanation for his responses) (quotation omitted); *Gallagher v. Berryhill*, 2017 WL 2791106, at *8 (N.D. Ohio June 12, 2017)." *Duke*, 2022 WL 1075171, at *3. This applies even where the ALJ does not identify the format as a reason for rejecting the opinion. *Id.* at *3 n.2.

Here, Dr. Thakore's medical source statement does not provide an explanation beyond stating that the medical findings included "Depressed" and "Anxious [with] social anxiety." (Tr. 457.) Dr. Thakore did not describe why or how these findings are relevant to the work-preclusive limitations she opined, including additional breaks or absences and time off-task. (*Id.*) For this additional reason, the ALJ was entitled to find Dr. Thakore's opinion unpersuasive. *Duke*, 2022 WL 1075171, at *3.

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While Buschow would weigh the evidence differently, it is not for the Court to do so on appeal.

Again, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

24

**IT IS SO ORDERED.**

Date: September 2, 2025

                                   *s/ Jonathan Greenberg*
                                 Jonathan D. Greenberg
                                 United States Magistrate Judge